IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

FIRST AMERICAN TITLE INSURANCE CO.,

      Plaintiff,

v.                        CIVIL ACTION NO. 1:16cv219
                                 (Judge Keeley)

BOWLES RICE, LLP,

      Defendant.

**MEMORANDUM OPINION AND ORDER DENYING THE PARTIES'
MOTIONS FOR SUMMARY JUDGMENT [DKT. NOS. 168; 170]**

Pending before the Court are the parties' competing motions for summary judgment (Dkt. Nos. 168; 170). For the following reasons, the Court **DENIES** the motions.

## I. INTRODUCTION

For a detailed summary of the factual and procedural background in this case, the Court incorporates its statement of the facts in the related case of <u>ALPS Property & Casualty Company v. Bowles Rice, LLP</u>, Civil Action No. 1:18CV29, Dkt. No. 48 at 2-13. The plaintiff, First American Title Insurance Company ("First American"), is a title insurance company with an office in Barboursville, West Virginia. The defendant, Bowles Rice, LLP ("Bowles Rice"), is a law firm with offices in, among others, Charleston and Morgantown, West Virginia.

The parties' relationship is contractual. In 1994, First American and Bowles Rice entered into a Limited Agency Agreement in which First American appointed the Bowles Rice office in Charleston

to act as its agent throughout West Virginia ("the 1994 Agency Agreement"). Carl Andrews, a partner at the office in Charleston, executed the agreement on Bowles Rice's behalf. When the parties amended the agreement in 2003, Charles Dollison ("Dollison"), another partner in the Charleston office, executed the addendum for Bowles Rice. In 2006, First American and Bowles Rice entered into a separate Agency Agreement in which First American appointed the Bowles Rice office in Morgantown, West Virginia, to act as its agent throughout the state ("the 2006 Agency Agreement"). Charles Wilson ("Wilson"), a partner in the firm's Morgantown office, executed that agreement for Bowles Rice.

The pending case is one of many flowing from the ill-fated construction of a $2 billion coal-fired power plant by Longview Power, LLC ("Longview"), straddling the border of Monongalia County, West Virginia, and Greene County, Pennsylvania. Financing for the Longview project was secured by a deed of trust in favor of Union Bank of California, N.A. ("Union Bank"). When Union Bank's financing closed on February 28, 2007, First American issued an owner's and lender's policy for the West Virginia properties and an owner's and lender's policy for the Pennsylvania properties.

At issue in this case is Union Bank's $775 million lender's policy for the West Virginia properties that Dollison signed on

**MEMORANDUM OPINION AND ORDER DENYING THE PARTIES'**
**MOTIONS FOR SUMMARY JUDGMENT [DKT. NOS. 168; 170]**

behalf of First American ("Lender's Title Policy").[1] At Union Bank's request, the Lender's Title Policy included an endorsement that covered risks related to mechanic's liens.

The Longview project took a turn for the worse in 2012 when Longview's contractors filed mechanic's liens totaling in excess of $335 million. Because the contractors might claim that their liens held priority over its deed of trust, Union Bank filed a claim on First American under the Lender's Title Policy in April 2013. Longview subsequently filed for bankruptcy protection in the District of Delaware in August 2013. After extensive litigation, in December 2014, First American agreed to pay $41 million to settle Union Bank's claim as part of Longview's bankruptcy proceeding.

In November 2016, First American filed this case against Bowles Rice, claiming that Bowles Rice caused its losses under the Lender's Title Policy by breaching its duties under the parties' agency agreements. More particularly, First American claims that Bowles Rice knew construction had commenced on the Longview project, thereby presenting a risk of mechanic's liens senior in

---

[1] Dollison also signed the owner's policy for West Virginia, but because neither Dollison nor Wilson were licensed title agents in Pennsylvania, First American itself issued the policies for Pennsylvania. Nonetheless, the Bowles Rice office in Morgantown conducted title examinations related to the Longview project in Pennsylvania (Dkt. No. 172-1 at 6).

priority to Union Bank's deed of trust, but failed to advise First American of this risk pursuant to its obligations under the 1994 and 2006 Agency Agreements.

## II. STANDARD OF REVIEW

Summary judgment is appropriate where the "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)(1)(A). "When cross-motions for summary judgment are submitted to a district court, . . . the facts relevant to each must be viewed in the light most favorable to the non-movant." Mellen v. Bunting, 327 F.3d 355, 363 (4th Cir. 2003); see also Providence Square Assocs., L.L.C. v. G.D.F., Inc., 211 F.3d 846, 850 (4th Cir. 2000). The Court must avoid weighing the evidence or determining its truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of informing the Court of the basis for the motion and of establishing the

nonexistence of genuine issues of fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). Once the moving party has made the necessary showing, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." <u>Anderson</u>, 477 U.S. at 256 (internal quotation marks and citation omitted). The "mere existence of a scintilla of evidence" favoring the non-moving party will not prevent the entry of summary judgment; the evidence must be such that a rational trier of fact could find for the nonmoving party. <u>Id.</u> at 248–52. Nor can the non-movant "create a genuine issue of material fact through mere speculation or the building of one inference upon another." <u>Runnebaum v. NationsBank of Md., N.A.</u>, 123 F.3d 156, 164 (4th Cir. 1997).

### III. APPLICABLE LAW

This case involves the interpretation of agency agreements, lien waivers, and various other contracts. "A federal court exercising diversity jurisdiction is obliged to apply the substantive law of the state in which it sits." <u>Volvo Constr. Equip. N. Am. v. CLM Equip. Co., Inc.</u>, 386 F.3d 581, 599–600 (4th Cir. 2004) (citing <u>Erie R.R. Co. v. Tompkins</u>, 304 U.S. 64, 79 (1938)). In West Virginia, "[a] claim for breach of contract requires proof of the formation of a contract, a breach of the

**MEMORANDUM OPINION AND ORDER DENYING THE PARTIES'
MOTIONS FOR SUMMARY JUDGMENT [DKT. NOS. 168; 170]**

terms of that contract, and resulting damages." Sneberger v. Morrison, 776 S.E.2d 156, 171 (W. Va. 2015) (citing Syl. Pt. 1, State ex rel. Thornhill Group, Inc. v. King, 759 S.E.2d 795 (W. Va. 2014)). In addition, the plaintiff must "show that he has complied with the contract himself, . . . and, if the evidence shows that he has not complied with the terms of the contract, and has not been prevented or relieved therefrom as aforesaid, he will be denied a recovery from the breach of same." Charleston Nat'l Bank v. Sims, 70 S.E.2d 809, 813 (W. Va. 1952) (quoting Jones v. Kessler, 126 S.E. 344 (W. Va. 1925)); see also Exec. Risk Indem., Inc. v. Charleston Area Med. Ctr., Inc., 681 F. Supp. 2d 694, 714 (S.D.W.Va. 2009) (citing 23 Williston on Contracts § 63:1 (Richard A. Lord, ed., 4th ed. West 2009)).

When the existence of a written contract is not in dispute, "[i]t is the province of the Court, and not of the jury, to interpret" the contract. Syl. Pt. 1, Toppings v. Rainbow Homes, Inc., 490 S.E.2d 817 (W. Va. 1997). "A valid written instrument which expresses the intent of the parties in plain and unambiguous language is not subject to judicial construction or interpretation but will be applied and enforced according to such intent." Syl. Pt. 4, Zimmerer v. Romano, 679 S.E.2d 601 (W. Va. 2009) (quoting Syl. Pt. 1, Sally-Mike Props. v. Yokum, 332 S.E.2d 597 (W. Va.

**MEMORANDUM OPINION AND ORDER DENYING THE PARTIES'
MOTIONS FOR SUMMARY JUDGMENT [DKT. NOS. 168; 170]**

1985)). "[I]t is the duty of the court to construe [a written instrument] as a whole, taking and considering all the parts together, and giving effect to the intention of the parties wherever that is reasonably clear and free from doubt." <u>Zimmerer</u>, 679 S.E.2d 601, Syl. Pt. 5 (quoting Syl. Pt. 5, <u>Hall v. Hartley</u>, 119 S.E.2d 759 (W. Va. 1961)).

"A contract is ambiguous when it is reasonably susceptible to more than one meaning in light of the surrounding circumstances and after applying the established rules of construction." <u>Williams v. Precision Coil, Inc.</u>, 459 S.E.2d 329, 342 n.23 (W. Va. 1995). Only if a contract is ambiguous may the Court resort to "the situation of the parties, the circumstances surrounding them when the contract was entered into[,] and their subsequent conduct." <u>Zimmerer</u>, 679 S.E.2d 601, Syl. Pt. 7 (quoting Syl. Pt. 2, <u>Snider v. Robinett</u>, 88 S.E. 599 (W. Va. 1916)).

## IV. DISCUSSION[2]

**A.    The 2006 Agency Agreement may apply to this case.**

As an initial matter, Bowles Rice contends that the 1994 Agency Agreement is the only contract applicable to this case.

---

[2] As appropriate, the facts relevant to each cross-motion for summary judgment are viewed in the light most favorable to the non-moving party. <u>Mellen</u>, 327 F.3d at 363.

**MEMORANDUM OPINION AND ORDER DENYING THE PARTIES'**
**MOTIONS FOR SUMMARY JUDGMENT [DKT. NOS. 168; 170]**

According to Bowles Rice, because Dollison's duties as an agent were governed by the 1994 Agency Agreement, and he signed the Lender's Title Policy upon which First American bases its allegations, the 2006 Agency Agreement is inapplicable (Dkt. Nos. 171 at 7; 179 at 10).

Whether Bowles Rice breached the 2006 Agency Agreement is much more fact-bound than Bowles Rice's simple observation that Dollison signed the Lender's Title Policy. Neither party's motion adequately addresses whether the alleged title work performed by Wilson and the Morgantown office falls under the 2006 Agency Agreement. Indeed, both parties recognize that deciding whether the 2006 Agency Agreement applies in this case involves questions of fact that are not necessary to resolve in order to decide the pending motions (Dkt. Nos. 171 at 7; 172 at 15 n.4). Therefore, the Court will focus its analysis on application of the 1994 Agency Agreement, and reserve for trial whether Bowles Rice breached the 2006 Agency Agreement.

**B.    First American is not entitled to summary judgment on the question whether Bowles Rice breached the 1994 Agency Agreement.**

First American contends that Bowles Rice breached the 1994 Agency Agreement when it failed to inform First American that

construction had commenced on the Longview property (Dkt. No. 172 at 14-17). A mechanic's lien attaches "as of the date such labor, material, machinery or other necessary equipment shall have begun to be furnished, and shall have priority over any other lien secured by a deed of trust or otherwise which is created subsequent to such date." W. Va. Code § 38-2-17. Under the 1994 Agency Agreement, Bowles Rice was required to determine insurability based, in part, on "[t]he absence of knowledge by Agent or approved attorney of any fact, doubt, or rumor which may adversely affect the interest of the proposed insured or the real property to be described in the policy" (Dkt. No. 170-18 at 3). It follows that, when Bowles Rice asked First American to authorize issuance of the Lender's Title Policy, Bowles Rice was required to advise if it had knowledge of such a "fact, doubt, or rumor." See id. at 2-3.

As Longview's efforts to finance the project drew to a close, on February 13, 2007, several parties opposed to the project filed suit against Longview and its contractors, alleging that a necessary Prevention of Significant Deterioration ("PSD") permit under the Clean Air Act ("CAA") had expired ("the Jamison litigation") (N.D.W.Va., Civil No. 1:07cv20, Dkt. No. 1). Bowles Rice partner Leonard Knee ("Knee") responded to the Jamison litigation on behalf of Longview. He argued, in part, that West

9

Virginia regulations approved by the Environmental Protection Agency required a PSD permit to be revoked after 18 months only if Longview could not provide "written proof of a good faith effort that . . . construction . . . has commenced" (N.D.W.Va., Civil No. 1:07cv20, Dkt. No. 10-1 at 14-16). He also unequivocally advised the Court that construction activities had commenced, including "preliminary site establishment activities such as clearing and grubbing of vegetation, grading for placement of construction offices and an access road, [and] placement of stone base material on the access road and parking area" (N.D.W.Va., Civil No. 1:07cv20, Dkt. No. 12-2 at 9).

Around the same time, Dollison and Knee were involved in the preparation of a permitting opinion letter for Union Bank, which at the lender's request, included an express opinion that construction had commenced for purposes of the CAA permit (Dkt. No. 174-2 at 370). When Dollison became aware of this request on February 21, 2007, he asked Union Bank's counsel to "give [him] a call about the . . . requested express opinion on commence construction" because Bowles Rice could not "give that without a lengthy discussion of the pending case." Id. at 376. In his deposition, however, Dollison testified that he had only a general knowledge of the Jamison

**MEMORANDUM OPINION AND ORDER DENYING THE PARTIES'
MOTIONS FOR SUMMARY JUDGMENT [DKT. NOS. 168; 170]**

litigation, and that he could not remember whether he knew in February 2007 that work had commenced. Id. at 27, 33-35.

Viewed in the light most favorable to Bowles Rice, questions of fact exist regarding whether Dollison's knowledge of the Jamison litigation and permitting issues was detailed enough to constitute a "fact, doubt, or rumor" that construction actually had commenced on the Longview property sufficient for a mechanic's lien to attach. In light of these questions, First American is not entitled to summary judgment on the issue whether Bowles Rice breached the 1994 Agency Agreement because of Dollison's knowledge that work had commenced on the site of Longview's project.[3]

**C.    The 1994 Agency Agreement includes an express indemnification provision that may apply to this case.**

The parties dispute whether the 1994 Agency Agreement expressly requires Bowles Rice to indemnify First American for the $41 million settlement in bankruptcy court (Dkt. Nos. 179 at 10-12; 192-2 at 8-9).

West Virginia recognizes both express and implied duties of indemnification. Express indemnity is based on a written agreement and "can provide the person having the benefit of the agreement,

---

[3] Notably, neither party addresses whether Knee's undisputed knowledge of work done on the Longview property is imputable to Dollison under the principles of partnership law.

MEMORANDUM OPINION AND ORDER DENYING THE PARTIES'
MOTIONS FOR SUMMARY JUDGMENT [DKT. NOS. 168; 170]

the indemnitee, indemnification even though the indemnitee is at
fault." Syl. Pt. 1, Valloric v. Dravo Corp., 357 S.E.2d 207 (W. Va.
1987). Implied indemnity, on the other hand, arises out of a
relationship between the parties. Id. To receive the benefit of
implied indemnification, the indemnitee's "independent actions"
must not have "contribute[d] to the injury." Syl. Pt. 6,
Ruckdeschel v. Falcon Drilling Co., LLC, 693 S.E.2d 815 (W. Va.
2010) (quoting Syl. Pt. 2, Harvest Capital v. W. Va. Dep't of
Energy, 560 S.E.2d 509 (W. Va. 2002)).[4]

The 1994 Agency Agreement provides that Bowles Rice is
responsible for indemnification in the following circumstances:

> Agent shall be liable for the first one Thousand Dollars
> ($1,000.00) of each and every loss or expense arising
> from a policy issued by Agent and any loss, cost or
> expense occassioned [sic] by assumption of a risk not
> authorized by the Company.

(Dkt. No. 170-18 at 5). Bowles Rice contends that its liability, if
any, is limited to $1,000 because First American authorized it to
issue the Lender's Title Policy (Dkt. No. 179 at 11-12). Indeed,
First American employees have confirmed that First American
authorized Bowles Rice to issue the Lender's Title Policy, knowing

---

[4] The 2006 Agency Agreement undoubtedly includes an express
indemnification provision (Dkt. No. 170-10 at 8-9). But, as
discussed earlier, whether the agreement applies under the
circumstances is disputed by the parties. See supra Part IV.A.

that it included a mechanic's lien endorsement (Dkt. Nos. 172-23 at 8; 183-5 at 2-3; 183-6 at 2).

First American, on the other hand, contends that Bowles Rice is liable for its entire loss because First American authorized a mechanic's lien endorsement without being fully advised by its agent of the risk entailed (Dkt. No. 172 at 18). Resolution of this dispute requires analysis of the phrase "assumption of a risk not authorized by the Company" (Dkt. No. 170-18 at 5).

The 1994 Agency Agreement does not define "assumption" or "risk," but the Court is aided by dictionary definitions. See Nat'l Union Fire Ins. Co. v. Miller, 724 S.E.2d 343, 352 (W. Va. 2012). "Assume" means "to take to or upon oneself." Assume, Merriam-Webster, https://www.merriam-webster.com/dictionary/assume. In the context of insurance, "risk" is "[t]he chance or degree of loss to the subject matter of an insurance policy" or "the amount that an insurer stands to lose." Risk, Black's Law Dictionary (10th ed. 2014). Under these definitions, the 1994 Agency Agreement would require Bowles Rice to fully indemnify First American even in some circumstances, such as the instant case, where First American authorizes a policy or endorsement. In other words, if Bowles Rice requested and received authorization to issue a mechanic's lien endorsement, but did not disclose "the chance or degree of loss"

**MEMORANDUM OPINION AND ORDER DENYING THE PARTIES'
MOTIONS FOR SUMMARY JUDGMENT [DKT. NOS. 168; 170]**

that such an endorsement would entail, it could be said that Bowles Rice assumed a risk not authorized by First American.

But "Risk" may also mean "[t]he type of loss covered by a policy; a hazard from a specified source." Id. In fact, looking at the context of the entire instrument, Zimmerer, 679 S.E.2d 601, Syl. Pt. 5, the 1994 Agency Agreement appears to utilize this form of the definition. Bowles Rice is not authorized to act for First American with regard to "[a]ny proposal or agreement to accept or insure over any special or extraordinary risks not contemplated in the Company's forms including, but not limited to, mechanic lien risk, without prior approval by the Company" (Dkt. No. 170-18 at 3). Under this reading, Bowles Rice would only be required to indemnify First American when it insured over an extraordinary risk, such as issuing a mechanic's lien endorsement, without receiving authorization from First American. First American would otherwise be limited to holding Bowles Rice liable for the first $1,000 of loss, even where Bowles Rice omitted critical details when requesting the endorsement from First American. Id.[5]

---

[5] Although this result seems absurd when the agent is issuing $775 million in title insurance, one must recall that the 1994 Agency Agreement capped Bowles Rice's authority at $500,000 (Dkt. No. 170-18 at 2). Moreover, the parties are free to contract for the express indemnification provision of their choosing, as illustrated by the much more comprehensive indemnity provision in

14

Consequently, even after application of the established rules of construction, what constitutes "assumption of a risk not authorized by the Company" is reasonably susceptible to two different meanings. <u>Williams</u>, 459 S.E.2d at 342 n.23. Neither party, therefore, is entitled to summary judgment regarding whether the 1994 Agency Agreement requires express indemnification in this case.

**D.  Factual disputes preclude a ruling regarding whether Bowles Rice had a duty to indemnify First American.**

Even if the 1994 Agency Agreement expressly imposes a duty to indemnify, there are material facts in dispute regarding whether First American is entitled to be indemnified in the amount of $41 million. When an indemnitee settles its liability to a third party, there are two possible burdens of proof; the indemnitee must either establish that it was potentially or actually liable to recover from the indemnitor. <u>Valloric</u>, 357 S.E.2d at 211.

**1.  There are material facts in dispute regarding whether First American provided adequate notice.**

"[W]hether actual or potential liability must be shown depends on whether the indemnitor . . . had actual notice of the underlying claim, an opportunity to defend it, and the right to participate in

_____

the 2006 Agency Agreement (Dkt. No. 170-10 at 8-9).

15

**MEMORANDUM OPINION AND ORDER DENYING THE PARTIES'
MOTIONS FOR SUMMARY JUDGMENT [DKT. NOS. 168; 170]**

any settlement negotiations." Id. These factors are commensurate with an indemnitee's duty to provide "reasonable notice . . . of a claim that is covered by [an] indemnity agreement." VanKirk v. Green Const. Co., 466 S.E.2d 782, 789 (W. Va. 1995). Disputed questions regarding notice, including its reasonableness under the circumstances, are reserved for the trier of fact under West Virginia law. See, e.g., Syl. Pt. 1, Dairyland Ins. Co. v. Voshel, 428 S.E.2d 542 (W. Va. 1993) (holding that the reasonableness of notice provided to an insurer "ordinarily becomes a question of fact"); Johnson v. Inter-Ocean Cas. Co., 164 S.E. 411, 412 (W. Va. 1932) (referring to "proper notice" as a question of fact).

Here, First American contends that it must only prove potential liability because two letters it sent Bowles Rice constitute adequate notice under the circumstances (Dkt. No. 172 at 12-13). On May 6, 2014, First American's Senior Claims Counsel, Brian Barlow ("Barlow"), sent a letter to Dollison summarizing the nature of the "title issue" in Longview's bankruptcy proceeding, including that the mechanic's liens claimed priority over the deed of trust because "construction work began on the project prior to

MEMORANDUM OPINION AND ORDER DENYING THE PARTIES'
MOTIONS FOR SUMMARY JUDGMENT [DKT. NOS. 168; 170]

the recording of the Deed of Trust" (Dkt. No. 172-18 at 74).[6]

Barlow further advised Dollison that

> [t]he lien priority issues have proceeded to mediation in
> the Bankruptcy Court. Based on the information available
> to date, your firm should put its liability insurance
> carrier on notice of this claim if it has not already
> done so. Please confirm in writing that you have put your
> liability insurance carrier on notice of this claim.

Id. On "May 19, 2014, Bowles Rice notified ALPS of a potential

claim arising out of" its services on the Longview project (Dkt.

No. 172-24 at 32). On May 21, 2014, Dollison sent an email to

Barlow confirming that Bowles Rice had placed its carrier on notice

of the claim (Dkt. No. 172-18 at 75).

In the second letter from Barlow to Dollison, dated July 14,

2014, Barlow noted that "[t]o date, I have not been contacted by

any representative of the insurance carrier regarding the

investigation of [the] claim. Nor, despite knowledge of the ongoing

litigation, has the insurance carrier involved itself in this

---

[6] Although First American focuses on the letters it sent to
Bowles Rice in 2014, Dollison actually was aware of the lien
priority issues well in advance of that. On May 1, 2013, shortly
after Union Bank lodged its claim, Dollison emailed Laura Wareheim
("Wareheim"), the First American employee who authorized issuance
of the Lender's Title Policy (Dkt. No. 172-23 at 8), advising that,
even if $300 million of mechanic's liens held priority over the
deed of trust, he was confident they would be covered by Longview's
significant equity and would never involve the Lender's Title
Policy (Dkt. No. 174-2 at 418).

matter." <u>Id.</u> at 76. The letter also stated that First American was proceeding with settlement negotiations, and possibly might settle the case in the absence of "communication or objections" from either Bowles Rice or its carrier. <u>Id.</u> Around this same time, Bowles Rice also received a subpoena duces tecum and a notice of deposition related to the ongoing litigation, and even retained counsel. It did not, however, involve itself in Longview's bankruptcy proceeding (Dkt. No. 172-24 at 7-8).

The content of First American's letters is straightforward, and their effects are undisputed. But neither party has sufficiently developed a record of the surrounding circumstances, which also will inform the adequacy of notice. For instance, although Union Bank lodged its claim with First American in April 2013 (Dkt. No. 174 at 2), and Dollison had knowledge of the mechanic's lien issues at that time, First American has not offered evidence regarding why it waited until May 2014 to advise Bowles Rice to put its carrier on notice of the claim (Dkt. No. 172-18 at 74).[7] First American's activities during this period bear directly

---

[7] First American's "status history" regarding the claim reflects only that it thought the mechanic's liens did not assert priority over Union Bank's deed of trust (Dkt. No. 174 at 5).

on whether Bowles Rice actually had a reasonable opportunity to defend the claim.

Moreover, as First American readily admits, it did not place Bowles Rice on notice of the claim until after the first mediation had taken place in Longview's bankruptcy, and only one week before First American filed suit against Union Bank in California state court (Dkt. Nos. 170-2; 172 at 21). Whether First American participated in the first mediation session is unclear (Dkt. No. 170-2); if it did so without informing Bowles Rice, however, such an action would be relevant to whether Bowles Rice had an opportunity to participate in any settlement negotiations. See Valloric, 357 S.E.2d at 211. Thus, there are material facts in dispute regarding the adequacy of First American's notice.

**2.    There are material facts in dispute regarding whether First American reasonably settled the claim in light of its potential liability.**

"Where an indemnitor has not been notified . . . and given an opportunity to participate in the settlement negotiations, then an indemnitee must prove that he was actually liable to the plaintiff." Id., 357 S.E.2d 207, Syl. Pt. 3. On the other hand, "[w]here a party having a duty to indemnify has been notified or been made a party to the underlying proceedings and given an

MEMORANDUM OPINION AND ORDER DENYING THE PARTIES'
MOTIONS FOR SUMMARY JUDGMENT [DKT. NOS. 168; 170]

opportunity to participate in its settlement negotiations . . . the defendant-indemnitee should not be required to prove" that it was actually liable "to recover the amount paid in the settlement." Id., 357 S.E.2d 207, Syl. Pt. 2. Rather, "[u]nder a potential liability standard, the indemnitee must in his indemnity suit show that the original claim is covered by the indemnity agreement. Then he must demonstrate that he was exposed to liability which could reasonably be expected to lead to an adverse judgment. Finally, he must prove that the amount of the settlement was reasonable." Id., 357 S.E.2d 207, Syl. Pt. 4. "The focus must remain on what was a reasonable judgment in light of the circumstances at the time the settlement was made." Id. at 213.

Valloric cited with approval Trim v. Clark Equipment Co., 274 N.W.2d 33, 36-37 (Mich. App. 1979) (internal quotation and citation omitted), where the court observed:

> Potential liability actually means nothing more than that the indemnitee acted reasonably in settling the underlying suit. The reasonableness of the settlement consists of two components which are interrelated. The fact finder must look at the amount paid in settlement of the claim in light of the risk of exposure. The risk of exposure is the probable amount of a judgment if the original plaintiff were to prevail at trial, balanced against the possibility that the original defendant would have prevailed. If the amount of the settlement is reasonable in light of the fact finder's analysis of these factors, the indemnitee will have cleared this hurdle. The fact that the claim may have been

successfully defended by a showing of contributory negligence, lack of negligence or otherwise, is but a part of the reasonableness analysis and, therefore, subject to proof.

Valloric, 357 S.E.2d at 214.

Assuming that it provided adequate notice to Bowles Rice, First American contends it is entitled to judgment as a matter of law that it reasonably settled a claim for which it was potentially liable (Dkt. No. 172 at 23-24). Bowles Rice, on the other hand, contends that the settlement was unreasonable because First American had strong defenses to the mechanic's lien claims (Dkt. No. 171 at 13-23). Based on these arguments, further factual development is needed, and neither party is entitled to summary judgment regarding First American's potential liability.

> **a.  First American is not entitled to summary judgment on potential liability.**

First American argues that, because construction commenced before it issued the Lender's Title Policy, the mechanic's liens had priority over Union Bank's deed of trust (Dkt. No. 172 at 24). It further contends that it made a "reasonable decision to settle" the $335 million claim for a "steep discount" of $41 million after "having its defenses rejected by the bankruptcy court at every turn." Id.

**MEMORANDUM OPINION AND ORDER DENYING THE PARTIES'
MOTIONS FOR SUMMARY JUDGMENT [DKT. NOS. 168; 170]**

Under the test in <u>Valloric</u>, First American must show that its settlement was reasonable "in light of the risk of exposure," which "is the probable amount of a judgment if the original plaintiff were to prevail at trial, balanced against the possibility that the original defendant would have prevailed." <u>Valloric</u>, 357 S.E.2d at 214 (quoting <u>Trim</u>, 274 N.W.2d at 36-37). This includes an analysis of whether the claim may have been successfully defended in whole or in part. <u>Id.</u>

First American has not addressed many aspects of this burden. For instance, was $335 million the true "risk of exposure," or did the mechanic's liens include amounts that were disputed by Longview? Another important question not taken up fully in First American's motion is whether construction actually had commenced for purposes of mechanic's lien attachment.[8]

---

[8] Although discussed in Bowles Rice's response brief (Dkt. No. 179 at 2-5, 21-23), neither party specifically moved for summary judgment on the fact-bound question regarding whether construction had commenced for purposes of mechanic's lien attachment or whether Union Bank's knowledge of site work brings its claim under section 3(a) of the Lender's Title Policy exclusions.

The site preparation sufficient to attach mechanic's liens under West Virginia law is not entirely clear. <u>Compare</u> Syl. Pt. 3, <u>Carolina Lumber Co. v. Cunningham</u>, 192 S.E.2d 722 (W. Va. 1972) ("[A]ll perfected mechanics' liens attach at the time the initial mechanic's lien comes into existence after the construction of the building or structure begins . . . ."), <u>with</u> <u>Augusta Apartments, LLC v. Landau Bldg. Co.</u>, No. 11-0438, 2011 WL 8197526 (W. Va. Oct. 21, 2011) (memorandum decision) (finding that preparatory work such

**MEMORANDUM OPINION AND ORDER DENYING THE PARTIES'
MOTIONS FOR SUMMARY JUDGMENT [DKT. NOS. 168; 170]**

Without addressing these key issues, First American simply notes the existence of Union Bank's claim and points to the settlement for less than the amounts asserted in the mechanic's liens. Such arguments, however, are insufficient to meet First American's burden to prove that it was potentially liable for Union Bank's claim. See id. Therefore, First American is not entitled to summary judgment regarding the reasonableness of its settlement.

> **b.    Bowles Rice is not entitled to summary judgment on
>        potential liability.**

Turning to Bowles Rice's motion, it contends that First American's settlement was unreasonable because "[t]he evidence in the record demonstrates that the likelihood Plaintiff would have prevailed at trial is overwhelmingly high" (Dkt. No. 171 at 15). It argues that 1) First American's own actions demonstrate that the settlement was unreasonable; 2) First American cannot establish that the mechanic's liens were valid; and 3) the mechanic's liens were fully released and could not relate back. Id. at 16.[9]

---

as "leveling, clearing trees and brush, and hauling out mud and rocks" was sufficient for mechanic's liens to attach). The mechanic's lien statutes, however, are liberally construed due to their remedial nature. Carolina Lumber, 192 S.E.2d at 726.

[9] Bowles Rice also contends that it is entitled to summary judgment because First American has not disclosed an expert witness regarding "the validity of the mechanic's liens and the strength of the contractors' claims" (Dkt. No. 171 at 13). Although expert

**MEMORANDUM OPINION AND ORDER DENYING THE PARTIES'
MOTIONS FOR SUMMARY JUDGMENT [DKT. NOS. 168; 170]**

With regard to its first argument, Bowles Rice contends that the settlement was unreasonable because First American initially set its reserve at $0 and, "[f]or nearly all of 2014, . . . maintained the position that settlement . . . would be unreasonable because the mechanic's liens were not valid and/or did not have priority." Id. The Court has already ruled that subjective evaluations such as reserves are irrelevant to the objective inquiry set forth in Valloric (Dkt. No. 128 at 12-14). Moreover, that First American settled the claim without "litigat[ing] its defenses" has nothing to do with the reasonableness of its settlement. Tellingly, had First American litigated its defenses, a settlement would have been unnecessary.

For its second argument, Bowles Rice contends that First American "cannot demonstrate that the mechanic's liens were valid" because the proper parties were not named in the contractors' lien notices and lawsuits (Dkt. No. 171 at 17). Pursuant to W. Va. Code

---

testimony on "the reasonableness of the claim's settlement and the underlying motivation for that settlement" certainly may be appropriate in a bench trial, Chicago Title Ins. Co. v. IMG Exeter Associates Ltd. P'ship, 985 F.2d 553, 1993 WL 273921, at *4 n.6 (4th Cir. 1993) (unpublished decision), it is within the Court's discretion whether to admit, consider, or accept expert testimony regarding the mechanic's liens or the strength of the contractors' claims. See id. Therefore, expert testimony on such legal issues is not necessary to First American's claim.

§§ 38-2-7 and 38-2-8, a mechanic's lien is discharged unless perfected and preserved by the filing of a notice of mechanic's lien within 100 days after project completion. Bowles Rice thus contends that the contractors' notices were insufficient because they failed to name the Monongalia County Development Authority ("MCDA"), which owned the property at issue (Dkt. No. 171 at 18). Review of the only notice of mechanic's lien filed by Bowles Rice, however, belies this argument and confirms that the MCDA is clearly named (Dkt. No. 170-14 at 2).

In addition, pursuant to W. Va. Code § 38-2-34, a lien holder must bring suit to enforce the lien within six months of filing a notice of mechanic's lien. The Supreme Court of Appeals of West Virginia has indicated that the lender and the trustee of the deed of trust are necessary parties to such a lien enforcement action. Syl. Pt. 4, Lunsford v. Wren, 64 S.E. 308 (W. Va. 1908).

Bowles Rice contends that the mechanic's liens were unenforceable because the enforcement actions did not name Union Bank or the trustee (Dkt No. 171 at 18-19). That Union Bank was not initially named in the contractors' enforcement actions is not a foolproof defense (Dkt. No. 170-15), however, as the state court may have allowed the contractors to amend their pleadings as necessary. See, e.g., O.G. Augir & Co. v. Warder, 81 S.E. 708, 708

25

**MEMORANDUM OPINION AND ORDER DENYING THE PARTIES'
MOTIONS FOR SUMMARY JUDGMENT [DKT. NOS. 168; 170]**

(W. Va. 1914); <u>Lunsford</u>, 64 S.E. at 315; <u>see also</u> <u>Earp v.
Vanderpool</u>, 232 S.E.2d 513, 516 (W. Va. 1976) (describing when mechanic's lien statutes are subject to either a strict or liberal construction).

Third and finally, Bowles Rice contends that the contractors were fully paid and released their right to assert mechanic's liens for work done prior to Union Bank's closing (Dkt. No. 171 at 19-2). This argument is unpersuasive; the very language of the partial lien waivers executed by the contractors establishes that mechanic's liens for subsequent work could relate back to when construction first commenced on the Longview project.

Undoubtedly, a contractor may waive his right to file a mechanic's lien. See <u>Bauer Enters., Inc. v. Frye</u>, 382 S.E.2d 71, 74 (W. Va. 1989).[10] But in West Virginia, "[a] valid written instrument which expresses the intent of the party in plain and unambiguous

---

[10] Bowles Rice cites to cases that generally address the fact that one may waive mechanic's liens, but not whether one's priority has been waived upon the execution of a partial lien waiver. Such cases are of little assistance to the Court's analysis. <u>See, e.g.</u>, <u>First Union Nat'l Bank v. RPB 2, LLC</u>, 674 N.W.2d 1 (N.D. 2004); <u>Durant Const., Inc. v. Gourley</u>, 336 N.W.2d 856, 658 (Mich. App. 1983) (finding that record supported conclusion that contractor intended to waive future liens). Moreover, Bowles Rice cites a case that actually contradicts its position. <u>See</u> <u>Lyda Swinerton Builders, Inc. v. Cathay Bank</u>, 409 S.W.3d 221, 230 (Tex. Ct. App. 2013) (noting that liens arising subsequent to a lien waiver relate back to the time when construction commenced).

26

language is not subject to judicial construction or interpretation but will be applied and enforced according to such intent." Kopf v. Lacey, 540 S.E.2d 170, 175 (W. Va. 2000) (quoting Syl. Pt. 1, Cotiga Dev. Co. v. United Fuel Gas Co., 128 S.E.2d 626 (1962)).

Here, the lien waivers resulted from the Construction Services Agreement between Longview and its contractors, which required the contractors, as a condition precedent to payment, to supply "a waiver and release of liens . . . in order to assure an effective release of mechanics' or materialmen's liens in accordance with the Applicable Laws of the State of West Virginia." The waiver form was to comply with what was "reasonably required by a title insurer providing title insurance to Owner or any Lender." The waiver forms utilized and executed by contractors during the project waived "all right that the undersigned may have to a lien upon the land and improvements . . . to the extent payment has been made to Contractor" (Dkt. No. 174-4 at 181).[11]

The language of the form lien waiver is plain and unambiguous. Although releasing the contractor's lien to the extent that payment

---

[11] From the record provided, it appears that Bowles Rice initially provided a draft lien waiver form to Longview that did not qualify the waiver "to the extent payment [had] been made" (Dkt. No. 174-2 at 484). The contractors, however, were not willing to utilize such a waiver. Id. at 478.

had been made, it says nothing about when future liens will attach. Therefore, future liens may still relate back for attachment purposes to the date that construction commenced. W. Va. Code § 38-2-17.

As First American aptly contends, this case is like <u>Wachovia Bank N.A. v. Superior Construction Corp.</u>, 718 S.E.2d 160 (N.C. App. 2011). There, the partial lien waiver stated that the contractor "[did] hereby waive, relinquish, surrender and release any and all lien, claim, or right to lien on the above said described project and premises, arising under and by virtue of the mechanic's lien laws of the State of North Carolina on account of any labor performed or the furnishing of any material to the above described project and premises up to and including the" date specified. <u>Id.</u> at 249-50.

The limited language in the partial lien waiver did not affect when future liens attached:

> [T]he plain meaning of a waiver of lien rights arising "on account of" labor performed before 31 May 2005 is that the only lien rights being waived are those arising "because of," "as a result of," or "on the basis of" work done prior to the relevant date. The language utilized in the partial lien waivers does not in any way refer to a waiver of Defendant Superior's "place in line;" instead, it simply refers to a waiver of "any and all" lien rights applicable to specific payments. In essence, the partial lien waivers at issue in this case function as an acknowledgment that a payment for labor and materials

> expended through a certain date has been made and that
> Defendant Superior has no further lien rights in the
> furnishing of labor and materials reimbursed by those
> payments. Thus, we conclude that the partial lien waivers
> executed by Defendant Superior merely operated as a
> waiver of its right to claim a lien on amounts for which
> it had been paid . . . .

Id. at 166. This holding is consistent with similar cases in other

states. See id. (citing Metropolitan Fed. Bank v. A.J. Allen, 477

N.W.2d 668, 673-75 (Iowa 1991); Duckett v. Olsen, 699 P.2d 734,

736-37 (Utah 1985)).

Because Bowles Rice has failed to conclusively establish that

First American was not potentially liable under the Lender's Title

Policy for at least a portion of the $335 million in mechanic's

liens filed and prosecuted by the contractors, it is not entitled

to summary judgment regarding its obligation to indemnify First

American for the losses sustained under the Lender's Title Policy.

**E.    This action is not barred by judicial estoppel.**

Finally, Bowles Rice contends that judicial estoppel bars

First American from "contending that the mechanic's liens filed by

the contractors on the Power Plant were valid and took priority

over the Credit Line Deed of Trust" because it took the opposite

position in prior litigation (Dkt. No. 171 at 23). After careful

review of the issue, the Court concludes that applying the doctrine

**MEMORANDUM OPINION AND ORDER DENYING THE PARTIES'
MOTIONS FOR SUMMARY JUDGMENT [DKT. NOS. 168; 170]**

of judicial estoppel would be an inappropriate exercise of its discretion. See <u>King v. Herbert J. Thomas Mem'l Hosp.</u>, 159 F.3d 192, 196 (4th Cir. 1998) (noting that the application of judicial estoppel is at the discretion of the district court).

"Judicial estoppel precludes a party from adopting a position that is inconsistent with a stance taken in prior litigation." <u>Minnieland Private Day Sch., Inc. v. Applied Underwriters Captive Risk Assurance Co., Inc.</u>, 867 F.3d 449, 457 (4th Cir. 2017) (quoting <u>John S. Clark Co. v. Faggert & Frieden, P.C.</u>, 65 F.3d 26, 28 (4th Cir. 1995)). "The purpose of the doctrine is to prevent a party from playing fast and loose with the courts, and to protect the essential integrity of the judicial process." <u>Id.</u> (quoting <u>John S. Clark Co.</u>, 65 F.3d at 29).

In order to apply the doctrine, a court must find that the following four circumstances exist:

> (1) the party sought to be estopped must be seeking to adopt a position that is inconsistent with a stance taken in prior litigation; (2) the position sought to be estopped must be one of fact rather than law or legal theory; (3) the prior inconsistent position must have been accepted by the court; and (4) the party sought to be estopped must have intentionally misled the court to gain unfair advantage.

Id. at 458 (internal quotation omitted) (quoting Lowery v. Stovall, 92 F.3d 219, 223-24 (4th Cir. 1996)). Notably, in the Fourth Circuit, the final element is determinative. Id.

Regarding the first element, as Bowles Rice contends, First American has adopted a somewhat different position in this case than it did in the earlier litigation related to the Lender's Title Policy. In the California litigation and its adversary proceeding in the Bankruptcy Court, First American argued that the contractors' mechanic's liens were both invalid and not entitled to priority over Union Bank's deed of trust. Here, First American contends that a settlement of $41 million was warranted based on the risks of an adverse judgment and the magnitude of the exposure it faced.

None of the other elements, however, are met under the facts of this case. As to the second element, the about-face of which Bowles Rice complains plainly involves legal contentions, not factual issues. Lowry, 92 F.3d at 225. Whether sufficient construction has commenced for a lien to attach or whether a mechanic's lien is valid and entitled to priority are, in the final instance, questions of law. Any perceived variation in First American's position on these legal theories is permissible. King v. Cardinal Health 411, Inc., 5:10CV112, 2011 WL 59672256, at *3

**MEMORANDUM OPINION AND ORDER DENYING THE PARTIES'**
**MOTIONS FOR SUMMARY JUDGMENT [DKT. NOS. 168; 170]**

(N.D.W.Va. Nov. 29, 2011) (Stamp, J.) (noting that "it is rare for judicial estoppel to be applied to prevent a party from changing legal theories" or "contradicting itself").

Under the third element, moreover, "judicial estoppel does not apply to the settlement of an ordinary civil suit because there is no judicial acceptance of anyone's position." Lowery, 92 F.3d at 225 (internal quotation omitted) (quoting Reynolds v. Commissioner, 861 F.2d 469, 473 (6th Cir. 1988)). Bowles Rice, however, contends that First American did not settle an "ordinary civil suit." "[W]hen a bankruptcy court - which must protect the interests of all creditors - approves a payment from the bankruptcy estate on the basis of a party's assertion of a given position," the party may be judicially estopped from later asserting a contrary position. Reynolds, 861 F.2d at 473. This principle, however, is grounded in the bankruptcy court's "obligation to apprise itself of the underlying facts and to make an independent judgment as to whether the compromise is fair and equitable." Id.

Here, the bankruptcy court was not called upon to make such independent judgments regarding the bankruptcy estate:

> First American and the Settling Contractors no doubt
> believe that they would prevail in their respective
> litigations with the Debtors. It cannot be disputed,
> though, that such litigations would be enormously complex
> and expose all sides to material risks of adverse

32

> judgments, measured not only by relation to the complex
> issues involved but also the magnitude of any potential
> adverse judgments.

(Dkt. No. 194-1 at 22). In essence, First American advised the

Bankruptcy Court that, while it stood behind its legal positions,

it had decided to mitigate the risk that it was wrong by settling

its liability for a sum certain. Clearly, this is not the type of

"judicial acceptance" contemplated for the purposes of estoppel,

even in the bankruptcy context. Cf. Reynolds, 861 F.2d at 473.

Finally, with regard to the fourth factor, Bowles Rice has not

established that First American "misled the court to gain unfair

advantage." Lowery, 92 F.3d at 223. Rather, First American defended

itself against liability on multiple fronts, but, ultimately,

conceded the potential of an "adverse judgment" when it decided to

settle in the Bankruptcy Court (Dkt. No. 194-1 at 22).

In sum, Bowles Rice has established only one of the four

factors necessary for application of judicial estoppel. And,

although not necessary to the analysis, the Court notes that a

contrary conclusion would defy logic and prevailing practice. Under

Bowles Rice's interpretation of judicial estoppel, a party could

not assert good faith defenses in an underlying action without

losing its right to seek indemnification if it then, pursuant to a

court-approved agreement, settles the case based on its potential

**MEMORANDUM OPINION AND ORDER DENYING THE PARTIES'**
**MOTIONS FOR SUMMARY JUDGMENT [DKT. NOS. 168; 170]**

liability. This result would be wholly inconsistent with the legal policy of encouraging settlements. <u>Cf.</u> <u>United States v. North Carolina</u>, 180 F.3d 574, 581 (4th Cir. 1999); <u>Valloric</u>, 357 S.E.2d at 212 & n.6. For all these reasons, the Court concludes that the doctrine of judicial estoppel does not apply to this case.

### V. CONCLUSION

For the reasons discussed, neither party is entitled to judgment as a matter of law regarding First American's breach of contract claims. Therefore, the Court **DENIES** the parties' motions for summary judgment (Dkt. Nos. 168; 170).

It is so **ORDERED**.

The Court directs the Clerk to transmit copies of this Order to counsel of record.

DATED: August 8, 2018.

/s/ Irene M. Keeley
IRENE M. KEELEY
UNITED STATES DISTRICT JUDGE